IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

HOWARD KEYSER,

      Plaintiff,

vs.

      Case No. C2-03-138
      Judge Edmund A. Sargus, Jr.
      Magistrate Judge Mark R. Abel

UNUM LIFE INSURANCE COMPANY
    OF AMERICA,

      Defendant.

## OPINION AND ORDER

This diversity case is before the Court on the Motion for Summary Judgment filed by Defendant, UNUM Life Insurance Company of America. Plaintiff, Howard Keyser, opposes the Motion. Because genuine issues of material fact remain for trial, Defendant's Motion for Summary Judgment is denied with respect to Plaintiff's breach of contract and bad faith claims. The Court also denies UNUM's Motion for Summary Judgment as to Plaintiff's request for punitive damages as premature.

**I.**

Plaintiff, Howard Keyser ("Keyser"), is a thirty-eight year old man who was injured on July 27, 1998 while operating a forklift for his then-employer, Town Air Freight. In the course of his work, Keyser was involved in a collision and thrown from his forklift, landing on his neck and back. Medical reports relating to his treatment from the accident reveal that Plaintiff suffered from a herniated lumbar disc and radiculapathy which resulted in lumbar instability.

At the time of his accident, Keyser was also employed by the Franklin County Board of Mental Retardation and Developmental Disabilities ("MRDD") as a training specialist. His job duties with MRDD included training and working with several mentally-challenged individuals.

Through his work with MRDD, Keyser was insured against long-term disability through a group policy issued to the MRDD by Defendant, UNUM Life Insurance Company of America ("UNUM") (Policy No. 00292846-0001 ("Policy")). Under the terms of the Policy, Keyser is entitled to long-term disability benefits ("LTD") if he is disabled. As defined by the Policy, "Disability" and "disabled" mean that, because of injury or sickness:

1. the insured cannot perform each of the material duties of his regular occupation; and
2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation[1] for which he is reasonably fitted by training, education or experience.

(Policy at L-DEF-4.)

The Policy also limits benefits for disabilities relating to mental illness. In particular, the Policy provides that "[b]enefits for disability due to mental illness will not exceed 24 months of monthly benefit payments . . . ."[2] (Policy at L-BEN-4.)

---

[1] "Gainful occupation" is not defined in the Policy. Upon review of the record, UNUM apparently defines the term "gainful occupation" as it relates to Keyser as one that would permit him to earn $7.20 per hour, or 60% of his indexed pre-disability earnings. (UACL00813, "[G]ainful = $7.20/hr."; UACL00815.)

[2] Under the terms of the Policy, the Mental Illness benefit generally is available for up to 24 months and may be extended subject to certain contingencies that are not relevant to this case. (Policy at L-BEN-4.)

Keyser submitted a claim for LTD on January 22, 1999. The claim form and corresponding doctor's statement indicate that Keyser suffered from back pain and pain radiating down his right leg. UNUM approved Keyser's claim on April 7, 1999. Pursuant to the 90-day elimination provision in the Policy, Keyser received benefits dating back to October 25, 1998 (90 days after the onset of disability).

On November 7, 1998, before he submitted his LTD claim, Keyser was admitted to the hospital for approximately eleven days for severe headaches that resulted in "spells" during which he lost consciousness. The hospital discharged Keyser without a clear diagnosis or understanding of the cause of these episodes.

On February 5, 1999, Keyser was evaluated by Dr. Michael Mulligan who reported that Keyser complained of an onset of headaches in November of 1998 that caused him significant pain. Dr. Mulligan also confirmed markedly decreased lumbar range of motion in all directions. (UACL00219) Dr. Mulligan referred Keyser to a pain clinic.

On April 16, 1999, Keyser was evaluated at the Pain Management Center of the Cleveland Clinic. Keyser reported that the headaches had become constant but were fluctuating and that he was subject to "blacking-out." (UACL00300). His records indicate that Keyser was reporting that he was "unable to work due to pain and stress, or chronic anticoagulation." (UACL00300).

As part of its claim management process, UNUM regularly made telephone calls to Keyser regarding the status of his condition. On February 28, 2000, a UNUM representative noted with respect to Keyser's claim:

> possibility that migraines are related to accident @ work
> when he gets the [headache], he lays down in a dark room-sometimes passes out
> . . .
> 30 minutes on feet max

(UACL00337)

While at the Cleveland Clinic, Keyser's medical reports in the month of August, 2000 continue to reflect a problem with headaches and blacking out. While in the program, Keyser experienced what was first thought to be a seizure. Keyser was intubated and transferred to the neurology intensive care unit. An EEG performed that day was essentially normal. For the remainder of his stay, Keyser's physicians attempted to rule out a seizure disorder and began to search for an organic cause to his condition. His final discharge summary from September 8, 2000 indicates that his diagnoses are as follows:

| | | |
|---|---|---|
| Approved Claims: | 1. | Herniated nucleus pulposis |
| | 2. | Lumbar sprain |
| | 3. | Thoracic sprain |
| | 4. | Lumbosacral/sacroiliac instability |
| Additional: | 1. | Psychogenic pseudoseizures |
| | 2. | Cluster/vascular headache vs. psychogenic headache |
| | 3. | Psychological factors affecting physical condition |
| | 4. | Rule out major depression |
| | 5. | Panic disorder |

(UACL00639.) During the extended, comprehensive program, Keyser submitted to a battery of tests, including psychological examinations. Keyser's discharge summary also mentions that "diagnostic considerations" for his problems included conversion disorder or somatization disorder. A "somitization disorder" is defined as "a chronic condition in which there are numerous physical complaints . . . that are caused by psychological problems and for which no underlying physical problems can be identified." (Medline Plus Medical Dictionary, Def's Exh.

-4-

2.) A "conversion disorder" is similarly defined as a psychiatric condition in which emotional distress or unconscious conflict are expressed through physical symptoms." (Medline Plus Medical Dictionary, Def's Exh. 3.)

While at the Cleveland Clinic, Keyser also underwent a functional capacity evaluation. The vocational expert indicated that Keyser could return to his job at the Board of MRDD which was classified within the light to medium work classification. The final conclusion of the discharge summary was that Plaintiff was physically able to return to work. (UACL00634.)

On December 12, 2000, records from the Cleveland Clinic indicate that Keyser still was having pseudoseizures daily. Consequently, Plaintiff was referred him to a neurologist. UNUM reviewed Keyser's claim and, on December 19, 2000, noted that Plaintiff was apparently physically able to return to work, but that the seizures were impacting his ability to perform this employment. UNUM noted that a secondary diagnosis of depression and panic disorder also were impacting Keyser's return to work date. (UACL00667.) UNUM extended Keyser's benefits beyond twenty-four months.

On July 27, 2001, UNUM noted in its claim file that "[t]here is no objective evidence to indicate a structural or metabolic etiology for [Keyser's] spells." (UACL00730) On August 22, 2001, UNUM informed Keyser that it was discontinuing his benefits effective July 25, 2001. In particular, UNUM said:

> As you have work capacity from a physical perspective and based on the above information, we conclude your inability to work, retroactive to November of 1998, has been related to your spells which are psychiatric in nature. Therefore, your claim is payable in accordance with the above provision. As the above provision limits benefits to 24 months, liability should have ceased in November 2000 . . .

(UACL00733.)

Keyser appealed the decision to terminate his LTD benefits and submitted the report of Dr. Mark J. Stillman in support of his claim. Stillman opines in his report of October 23, 2001 that he thinks Keyser suffers from "basilar migraine POTS[3] syndrome. This explains his syncope[4] and his mental status changes . . . ." (UACL00742.) An on-site neurologist working for UNUM, however, reviewed the new medical information and disagreed. Based on that review, UNUM informed Keyser that the medical information "does not support a level of impairment. In regards to Dr. Stillman, his assessment of basilar migraine POTS syndrome is speculative and is not borne out by previous studies. . . ." (UACL00751)

Plaintiff appealed this decision terminating his LTD. UNUM advised Keyser by letter dated December 10, 2001 that it had "not questioned that you may continue to be disabled, but rather that your continued condition is due to your psychiatric symptoms and not due to a physical condition. . . . (UACL00791)

Dr. Stillman wrote UNUM on March 22, 2002 that his patient "has some form of tachycardia syndrome . . . . At this point, [Stillman] would not feel confident to send this patient back to work. . . ." (UACL00791) Dr. Stillman noted that Keyser had recently fallen down stairs during a blackout. Dr. Stillman further informed UNUM that, because he had seen more patients with the POTS condition than anyone in the country, he felt confident that Keyser was suffering from it. (*Id.*)

---

[3] POTS is the acronym for postural orthostatic tachycardia syndrome. In his deposition, Dr. Stillman generally described POTS as it relates to Keyser's condition as one in which his blood pressure drops, his pulse rate increases and he loses consciousness when he stands up. (Stillman Dep., at 14, 21-25.) Stillman testified that Keyser's POTS episodes are usually accompanied by a migraine and that managing his condition is complicated by Keyser's diabetes.

[4] Syncope is a temporary loss of consciousness due to low blood pressure.

In February, 2002, Keyser was referred to a syncope clinic where he saw Dr. Fouard-Tarazi. Keyser submitted to a tilt table test which resulted in a gradual rise of blood pressure and resting sinus tachycardia. At the time of the test, Keyser had been off a prescription beta-blocker, Nadolol, for three days.[5] While Dr. Fouad's report indicated that Keyser did not suffer a blackout during the test, Dr. Fouad indicated that Keyser's increased heart rate during the test would fulfill criteria for POTS. She also could not rule out "possible rebound effect after Nadolol was on hold for 3 days vs effects of recent addition of Zonegrain vs primary Hyperkinetic Heart Syndrome." (UACL00771)

UNUM's neurologist, Dr. Alan Neuren, wrote to Dr. Stillman and spoke with him by telephone on May 7, 2002. Dr. Neuren documented the conversation with Dr. Stillman as follows:

> I have completed a telephone call to Dr. Stillman regarding the insured. I assured him that it is not his responsibility to determine whether Mr. Keyser can or can not work. I explained that we need to know what the insured can or can not do. He does feel the claimant should be restricted from any activity that might place him or another individual at risk, such as driving, operating hazardous equipment. The restrictions and limitations should be similar to those for people with epilepsy. Sedentary or light activity is not restricted. Heavier levels with the exclusion of the above examples should be allowed.

(UACL00793) Dr. Neuren prepared a written summary of the conversation containing these assertions and sent it to Dr. Stillman. Dr. Neuren asked Dr. Stillman to review the letter for errors and to sign it if he agreed with it. Dr. Stillman signed the letter and returned it to UNUM.

---

[5] Keyser had taken an earlier tilt test, but the results were inconclusive, which his physicians believed was the result of interference caused by a prescription beta-blocker. (UACL00741-42)

On May 13, 2002, UNUM hired a vocational consultant to review Keyser's file. UNUM stated that Keyser's claim originally had been allowed for a back injury, although it informed the consultant that he had been released from that condition. (UACL00814) UNUM indicated that Keyser "has also been diagnosed with depression and was paid under the 24-month mental and nervous limitation." (*Id.*) UNUM further indicated that Keyser's physicians had stated that he has "the capacity for sedentary or light work but should not be engaged in an activity that would put him or another individual at risk and should not be driving." (*Id.*) UNUM asked the consultant to make recommendations about jobs that Keyser may be able to perform based on these restrictions. UNUM directed its consultant to consider Keyser capable of a "gainful occupation" if he could earn a wage of $7.20 per hour. (UACL00813.) The consultant indicated that, based on Keyser's one year of college education and his employment background with the MRDD, as well as his experience as a warehouse worker for one year, Keyser could perform some of the sedentary, non-machinery work in his previous position and provided a list of other positions, such as recreation aide, shipping clerk, customer service representative or dispatcher, that he believed Keyser could perform. (UACL00812.)

On May 22, 2002, UNUM again notified Keyser that his LTD benefits were terminated due to the mental illness limitation in the policy. (UACL00817-815). In this letter, UNUM recognized that its initial determination to deny benefits was based on the mental illness limitation but that, in addition, it also concluded that Keyser was not disabled under the Policy because he was capable of working. (*Id.*)

On July 9, 2002, after re-evaluating Keyser and learning of several additional episodes in which Keyser fell, Dr. Stillman wrote UNUM and said "in spite of the conversation I had with

your neurologist, I do not think it is safe for him to return to any sort of work. At the present time, the danger of falling remains high even if he is in a sitting position. . . . [H]e should be on full disability." (UACL00822) UNUM, however, continued in its denial of benefits because Dr. Stillman had previously agreed that Keyser could perform light or sedentary work and because no new medical information had been submitted.

During his deposition, Dr. Stillman testified that he still believed Mr. Keyser could work at a sedentary position if "we find a position that he could work at. . ." (Stillman Dep., at p. 20.) Dr. Stillman emphasized, however, that he usually refused to do vocational evaluations because he had no training or expertise in that area, and that when he told UNUM that Keyser could work in a sedentary position, he would defer to someone who was trained to make such decisions. (Stillman Dep., at 25-26, 27.)

Dr. John W. Cunningham, a physician who specializes in occupational medicine, examined Keyser and reported as follows:

> Considering his numerous syncopal and near-syncopal episodes, this individual would be employable only in a sheltered workshop type environment with close supervision throughout his employment. Therefore, in my medical opinion, this individual is not reasonably employable, even in a sedentary job for the MRDD of the State of Ohio on a permanent basis.

(Def's Exh. 6.)

Finally, Dr. Gerald S. Steiman conducted a medical examination of Keyser on December 3, 2004. Dr. Steiman questioned the results of Keyser's tilt test examination and opined that the results were invalid insofar as Keyser had been on vasoactive medications. Dr. Steiman also indicated that he does not believe Keyser has basilar migraines. "A different explanation" according to Steiman, "would be a gentleman who has headaches with panic disorder." Steiman

does not believe that Keyser "has evidence of a permanent impairment and [he does] not believe that Mr. Keyser has a condition which renders him permanently unable to perform sustained remunerative employment." (Steiman Report, 12/3/04, Def's Supp. Memo., Exh. A.)

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment,

however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);*see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

### III.

**A. Ordinary Contract Principles Apply**

Keyser's claim is controlled by ordinary principles of contract law.[6] An insurance policy is a contract, the interpretation and construction of which is a matter of law. *Penn Traffic Co. v. AIU Ins. Co.*, 99 Ohio St. 3d 227, 229, 790 N.E.2d 1199, 1203 (Ohio 2003). "[I]nsurance contracts must be construed in accordance with the same rules as other written contracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St. 3d 657, 665, 597 N.E.2d 1096, 1102 (Ohio 1992)(citations omitted). "[T]he most critical rule is that which stops this court from rewriting the contract when the intent of the parties is evident, i.e., if the language of the policy's provisions is clear and unambiguous, this court may not 'resort to construction of that language.'" *Id.* (quoting *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403, 40

---

[6] The parties agree that the Employee Retirement Income Security Act, 29 U.S.C. § 1000 *et seq.*, ("ERISA") does not apply to the long-term disability policy issued to the MRDD. A plan established by a state, local, or regional authority is a governmental plan excluded from coverage under ERISA. *See* 29 U.S.C. §§ 1002(32) and 1003(b).

(Ohio 1984)). More directly, words and phrases contained in an insurance contract must always be given their natural and commonly accepted meaning so as to discern the parties' apparent objective and plain intentions. *Id.*

Thus, in order to successfully prosecute a breach of contract claim, Keyser must present evidence on several elements. Those elements include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (Ohio 1994).

In this case, the parties do not dispute the existence of the contract and that UNUM agreed to provide LTD coverage to Keyser if he was disabled. The issue turns, therefore, on whether UNUM breached the insurance contract. UNUM breached the contract by terminating Keyser's long-term disability benefits if Keyser was disabled, as that term is defined in the contract, at the time benefits were terminated. That is, because Keyser received benefits for more than 24 months, if he could not "perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience" at the time of benefits were terminated, UNUM breached the contract. (Policy at L-DEF-4.) Alternatively, UNUM breached the contract if it terminated LTD based on the mental illness limitation if Keyser does not suffer from a mental disability.

1. **Disability**

UNUM contends that Keyser is not entitled to LTD because he is not disabled under the terms of the policy. The Court concludes, however, that genuine issues of material fact remain in dispute regarding whether Keyser could "perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience."

UNUM argues that the record contains no evidence that Keyser is disabled under the terms of the Policy. It bases this conclusion on the reports of various doctors and argues that Keyser could perform certain jobs for which he is reasonably trained. This analysis, however, is complicated by the fact that UNUM did not terminate Keyser's benefits because he was no longer disabled. In fact, on December 10, 2001, after its initial decision to terminate benefits, UNUM notified Keyser that it had "not questioned" that Keyser continued to be disabled, but insisted that his condition was due to psychiatric symptoms, such that he was no longer entitled to LTD, given the mental illness limitation contained in the policy. (UACL00791) Only after its much-later determinations to uphold its denial of benefits, in May, 2002, did UNUM begin to take the position that Keyser was not disabled under the terms of the Policy.

Indeed, UNUM relies on miscellaneous entries in Keyser's medical records from the Cleveland Clinic that indicate that Keyser is physically able to return to his job or work in some gainful occupation. (UACL00634) These entries were made, however, prior to Keyser's diagnosis of POTS syndrome and before the doctors had any understanding of an organic cause for Keyser's migraines and blacking-out episodes. Moreover, UNUM relies on its vocational consultant's conclusions that Keyser could return to a variety of clerk-type positions. (UACL00805-817.) The vocational evaluation, however, was based on a fundamentally flawed assumption that Dr. Stillman had released Keyser to return to sedentary-type work, when the record reveals that Dr. Stillman never intended to make such a vocational assessment and was expressly assured by Dr. Neuron that it was "not his responsibility to determine whether Mr. Keyser can or can not work." (UACL00793.) The issue is put further into dispute by Dr. Stillman's subsequent opinion that Keyser was unable to work at all because of the danger of

falling, even from a sitting position.

UNUM insists that the only person who claims that Keyser is incapable of working in any occupation is Keyser. It argues that all of the physicians who have examined Keyser or reviewed his records believe that he is capable of some gainful employment. UNUM relies, for example, on Dr. Cunningham's opinion that Keyser "would be employable only in a sheltered workshop type environment with close supervision throughout his employment" (Def's Exh. 6) as conclusive evidence that Keyser is, for purposes of the insurance contract, capable of a gainful occupation. This characterization of Cunningham's report, however, ignores that portion of his opinion in which he states that "this individual is not reasonably employable, even in a sedentary job . . . ." (Id.)

UNUM, in effect is arguing that the contract term "any gainful occupation" means that Keyser is capable of "gainful" employment if has the capacity to perform any work at all. This interpretation of the contract, however, virtually redacts the phrases "gainful" and "for which he is fitted by training, education or experience." UNUM has at least once construed the term "gainful occupation" as it relates to Keyser as meaning that he must be able to earn at least 60% of his pre-disability salary, or $7.20 per hour. With the exception of the arguably flawed vocational evaluation conducted by a consultant hired by UNUM, the Defendant fails to point to evidence indicating that the Plaintiff can perform any of the jobs for which he was reasonably suited by his training, education or experience.

Because the evidence is in dispute regarding whether Keyser is unable to perform "each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience," Defendant's Motion for Summary Judgment is **DENIED** as to whether

Plaintiff was disabled under the terms of the contract.

### 2. Mental Illness Limitation

Keyser received LTD benefits for over twenty-four (24) months based on the severity of his initial back injury and complications arising from it. UNUM ultimately terminated his benefits pursuant to the 24-month mental illness limitation in the policy. (Policy at L-BEN-4.) The Policy limits benefits for disabilities relating to mental illness in that "[b]enefits for disability due to mental illness will not exceed 24 months of monthly benefit payments . . . ." (Policy at L-BEN-4.) UNUM argues that it properly discontinued benefits because Keyser's disability is due to mental illness and he was no longer eligible for benefits after 24 months.

UNUM argues that Keyser's diagnosis of POTS is not supported by the evidence, and that his condition instead is psychological in nature. That argument, however, invites the Court to draw inferences against Keyser, the non-moving party, and to make credibility determinations, which this Court is prohibited from doing under Rule 56.

The Court concludes, in rather summary fashion without repeating the substantial evidence set forth in the statement of facts, that the issue as to whether Keyser's condition is the result of a physical or mental condition is in dispute. Dr. Stillman, whose views and opinions are detailed in pages 6 through 9, *infra*, opines that Plaintiff suffers from POTS, a physicial impairment resulting in, *inter alia*, migraine headaches. Accordingly, Defendant's Motion for Summary Judgment in this regard is **DENIED**.[7]

---

[7] UNUM also argues that, to the extent Keyser asserts that he has a "new claim" based on a mental illness that is distinct from his previous claim, that claim is barred. The Court does not understand Keyser to make such an argument. Such allegation is not contained in Plaintiff's Complaint.

B.  **Bad Faith**

UNUM also contends that it acted reasonably as a matter of law and that the record contains no evidence of bad faith. Thus, UNUM seeks summary judgment on Keyser's bad faith claim.

"'[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, Syl. ¶ 1, 644 N.E.2d 397 (Ohio 1995). An insurer's lack of good faith in the processing of a claim is frequently referred to as "bad faith." Bad faith conduct gives rise to a cause of action in tort against the insurer. *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, Syl. ¶ 1, 452 N.E.2d 1315 (Ohio 1983). "Inasmuch as the breach of the duty to act in good faith is tortious in nature, punitive damages may be recovered against an insurer who breaches his duty of good faith in refusing to pay a claim of its insured upon adequate proof." *Id.* at 277, 452 N.E.2d 1315.

An insurer lacks reasonable justification for denying a claim when its refusal to pay is predicated on an arbitrary or capricious belief that the insured is not entitled to coverage. *Id.* at 277, 452 N.E.2d 1315. A court may properly grant summary judgment to an insurer on a claim of bad faith, however, where the record is devoid of any evidence tending to show a lack of good faith. *Labate v. Natl. City Corp.* (1996), 113 Ohio App.3d 182, 190, 680 N.E.2d 693 (Ohio Ct. App. 1996).

The essential inquiry is whether "the decision to deny benefits was arbitrary or capricious, and there existed a reasonable justification for the denial," not whether the insurance company's decision to deny benefits was correct. *See, e.g., Thomas v. Allstate Ins. Co.*, 974 F.2d 706, 711

(6th Cir.1992). To grant a motion for summary judgment brought by an insurer on the issue of whether it lacked good faith, a court must find, after viewing the evidence in a light most favorable to the insured, that the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim. *Tokles & Son. Inc. v. Midwestern Indem. Co.*, 65 Ohio St. 3d 621, 630-31 (Ohio 1992)(overruled in part on other grounds by *Zoppo*). To withstand a motion for summary judgment on a bad faith claim, an insured must present evidence which tends to show that the insurer had no reasonable justification for refusing the claim. *Id.* Intent, however, "is not and has never been an element of the reasonable justification standard." *Zoppo*, 71 Ohio St.3d at 555.

UNUM contends that, based on the information made available to it, it acted with a reasonable justification. Specifically, UNUM alleges that Keyser's medical records do not contain objective medical evidence demonstrating that he was disabled. Instead, UNUM contends that it acted reasonably in terminating benefits based on the mental health limitation contained in the insurance contract.

The Court concludes that, under Ohio law, reasonable minds could differ as to whether UNUM acted without reasonable justification in terminating Keyser's benefits based on the 24-month mental illness limitation. UNUM's records indicate that it knew Keyser's seizures were keeping him from working and that any psychological impairments that he was experiencing were considered "secondary diagnos[e]s." (UACL00667) UNUM persisted in this conclusion and upheld its decision in this regard even in light of evidence submitted by Keyser's treating physician of a physiological or organic cause for the migraine/blacking-out episodes. In the context of this record, a reasonable jury could possibly conclude that UNUM acted in bad faith

by recharacterizing Keyser's physical back-injury claim as one for mental illness, and then back-dating the effective date for benefits more than 24 months as if the claim had always been one for mental illness. Given that issues relating reasonableness are inherently fact-sensitive, and in this case would call for the Court to draw inferences in favor of UNUM in violation of Rule 56, summary judgment on Plaintiff's bad faith claim is **DENIED**.

**C.     Punitive Damages**

UNUM also asserts that Keyser's claim for punitive damages fails as a matter of law. [8] "The conduct necessary to support an award of punitive damages is separate from that sufficient to establish bad faith. Punitive damages are recoverable in an action against an insurance company for breach of its duty of good faith . . . only upon proof of actual malice, fraud, or insult on the part of the insurer. *CSS Publishing Co., Inc. v. Am. Economy Ins. Co.*, 138 Ohio App.3d 76, 86, 740 N.E.2d 341 (Ohio Ct. App. 2000)(citing *Hoskins*, 6 Ohio St.3d at 272, 452 N.E.2d 1315). "[A] finding of bad faith does not automatically entitle an insured to punitive damages. Rather, an award of punitive damages requires a finding of actual malice." *Furr v. State Farm Mut. Auto. Ins. Co.*, 128 Ohio App.3d 607, 621, 716 N.E.2d 250 (Ohio Ct. App. 1998)(citing *Zoppo*, 71 Ohio St.3d at 557-558, 644 N.E.2d 397).

The Court denies UNUM's Motion for Summary Judgment with respect to Plaintiff's request for punitive damages. At this juncture, the record is insufficient from which to determine whether reasonable minds could come but to one conclusion on the issue of punitive damages.

---

[8]     Plaintiff's demand for punitive damages is made with respect to his second cause of action for bad faith. The Court does not construe Plaintiff request for punitive damages as a separate and distinct claim apart from his bad faith cause of action.

It is the Court's practice to bifurcate the issue of punitive damages from the triable-liability issues of the case. In the event that Plaintiff receives a verdict in his favor against UNUM on the bad faith claim, the Court will revisit the question of whether Plaintiff has adduced sufficient evidence to justify sending the issue of punitive damages to the jury. Therefore, UNUM's Motion for Summary Judgment on Plaintiff's request for punitive damages is **DENIED**.

## IV.

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. #18) is **DENIED**. This case will be scheduled for immediate trial by separate Order of the Court.

**IT IS SO ORDERED.**

\_\_\_\_9-12-2005\_\_\_\_  
**DATED**

_____  
EDMUND A. SARGUS, JR.  
UNITED STATES DISTRICT JUDGE